356 N.W.2d 795 (1984)
In the Matter of the WELFARE OF E.L.H.
No. C6-84-707.
Court of Appeals of Minnesota.
October 30, 1984.
James J. Hulwi, Mankato, for appellant/Father.
David J. Twa, Blue Earth County Atty., Ross E. Arneson, Asst. County Atty., Mankato, for respondent/County.
Howard F. Haugh, Mankato, for respondent/Child.
Heard, considered and decided by FOLEY, P.J., and RANDALL and CRIPPEN, JJ.

*796 OPINION
FOLEY, Judge.
S.W.'s parental rights were terminated because of his continuing drinking problem and his inability to provide a suitable home for his son. S.W. appeals. We affirm.

FACTS
E.H. was born to mother J.H. and father S.W. in January 1982. J.H., then 17, and S.W., then 31, were never married. The child was conceived at a time when S.W. was under court order to have no contact with J.H.
When E.H. was approximately six months old, J.H. turned him over to Blue Earth County Social Services and voluntarily terminated her parental rights. The county also sought to terminate S.W.'s parental rights based on his chronic alcoholism, his long history of alcohol-related criminal offenses, his inability to keep a job and his inability to provide a suitable home and care for E.H. The trial court terminated S.W.'s parental rights.
A three judge district court panel reversed the termination order and remanded the matter with instructions to allow S.W. a minimum of six months to demonstrate "a reasonably minimal ability to maintain a parent-child relationship." In May 1983 the trial court adopted a plan agreed to by S.W. and the county.
In January 1984, the county again moved for termination of S.W.'s parental rights. At the second termination hearing the county presented evidence that S.W. violated virtually all of the terms of the May 1983 plan.
S.W. failed to control his drinking problem. He began chemical dependency counseling, but his attendance at counseling sessions became increasingly irregular. In November 1983, he stopped counseling altogether. By December 1983, he stopped attending Alcoholics Anonymous.
Two of S.W.'s drinking companions testified that starting in November 1983, S.W. drank to the point of intoxication three or four times a week. In December 1983 and January 1984, E.H.'s foster mother and a social worker observed signs that S.W. had been drinking before he picked up the child.
In February 1984, S.W.'s probation was revoked for drinking. He was on probation for a May 1982 assault on J.H. He was incarcerated at the time of the hearing.
S.W. also failed to establish a suitable home for E.H. In February 1984, he was evicted from his home for non-payment of rent and for allowing drunks to wander in and out at will. He and his drinking companions extensively defaced the property.
After S.W. was evicted he moved into a boarding house frequented by transients and drunks. S.W. admits the boarding house is not a good environment for a child. He also admits taking the child there when several residents were so intoxicated they had passed out.
In addition, S.W. failed to make scheduled visits to the foster home, failed to attend planning and review meetings concerning E.H., failed to complete parenting classes. Even when he was working, S.W. made no contribution toward the cost of E.H.'s care.
At the second termination hearing S.W. testified that he knew alcohol would be a constant problem, but he thought he could "get his act together" if given four months to complete a family recovery program at Immanuel-St. Joseph Hospital.

ANALYSIS
The Minnesota Supreme Court has adopted stringent standards for reviewing orders for termination of parental rights. In Re Welfare of J.W.M., 290 N.W.2d 770 (Minn.1980). The burden of proof is on the petitioner and there is a presumption that a parent is a fit and suitable person to be entrusted with the care of a child. Termination orders must be supported by clear, specific findings which conform to the statutory requirements. In Re Welfare of Chosa, 290 N.W.2d 766 (Minn. 1980). Termination should be affirmed only when the evidence clearly mandates *797 such a result. In Re Welfare of Kidd, 261 N.W.2d 833 (Minn.1978).
The trial court terminated S.W.'s parental rights pursuant to Minn.Stat. § 260.221, subd. (b)(4) (1982), because it found him to be "totally lacking in an ability to maintain a reasonable father-child relationship." The statute provides that parental rights may be terminated upon a showing:
That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child.
Alcoholism which interferes with a parent's long-term ability to provide a stable home or to care for a child may justify termination. In Re Welfare of C.L.L., 310 N.W.2d 555 (Minn.1981).
The trial court found that the county gave S.W. a chance to prove his ability to maintain a parent/child relationship. However, he rejected county efforts to help him overcome his drinking and to prepare him for his role as a parent. After an initial effort to stop, he began drinking heavily again. He stopped going to chemical dependency counseling sessions and Alcoholics Anonymous meetings. He never completed parenting courses arranged by the county. He never established a home suitable for a child. And, even when he was employed, he never contributed to E.H.'s support. This record supports the trial court's termination of parental rights.

DECISION
We affirm the trial court's termination of parental rights.
CRIPPEN, Judge (concurring specially).
Although concurring with the decision to terminate appellant's parental rights, I firmly hold the opinion that termination decisions must be reversed in the absence of positive proof that a child's welfare is endangered by critical, chronic parenting failures.
The facts here are sufficient for termination, but singularly because of the father's adamant preference for dangerous associations and living arrangements that destroy any hope for a plan to reunite him with his child.
I cannot subscribe to termination based primarily on the "continued alcoholism" of the father, whether or not that condition relates to his failure to offer parenting for the child. Nor do I believe that termination for that cause is supported by Matter of Welfare of C.L.L., 310 N.W.2d 555 (Minn.1981), cited in the majority opinion. There, as here, the father's disinterest in the needs of his child, not his drinking problem, justified termination.
In itself, problem drinking does not demonstrate harmful parenting. Rarely can one be confident the condition is irreversible. Often, continued social services will be helpful to persons affected by the problem. See Minn.Stat. § 260.155, subd. 7(6) (1982).
The evidence here focuses too little on the child, his needs, and his contacts with appellant. Still, the behavior of appellant shows a pattern of indeterminate failure to meet obvious needs of the child for a lasting, intimate parental contact.
The decision here is difficult in light of the unusually rigorous review called for in these cases. Appellate standards are considered "stringent," as noted in the majority opinion. Welfare of Chosa, 290 N.W.2d 766, 769 (Minn.1980). Further examination of those standards is important.
Appellate treatment of termination cases is unlike our approach in any other matter. This is so, first, because of the broad scope of review. We are to give "some deference" to the trial court, but are to "closely inquire" whether evidence is sufficient for termination. Matter of Welfare of Clausen, 289 N.W.2d 153, 156 (Minn.1980).
We are bound on appeal to exercise "great caution" in termination proceedings. Matter of Welfare of Kidd, 261 N.W.2d *798 833, 835 (Minn.1978). As the majority opinion indicates, the Kidd decision permits us to affirm a termination order only when the evidence "clearly mandates" that result.
In addition, the law demands a bias against termination of parental rights. The majority opinion includes reference to a presumption of parental fitness, a concept well-settled in Minnesota law. See In re Klugman, 256 Minn. 113, 118, 124, 97 N.W.2d 425, 428, 429, 432 (1959). Further, it is an established judicial discipline to preserve family ties for a child "whenever possible." In re Barron, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964). See Minn.Stat. § 260.011, subd. 2 (1982)[1].
For decades our Supreme Court has said that the reasons to permanently interfere with care for a child by a parent must be "grave and weighty." State ex rel. Platzer v. Beardsley, 149 Minn. 435, 438, 183 N.W. 956, 958 (1921). The reasons must be "real, cogent, strong, powerful, serious, as well as satisfactory and grave." In re Klugman, 256 Minn. 113, 123, 97 N.W.2d 425, 431 (1959); see State ex rel. Nelson v. Whaley, 246 Minn. 535, 545, 75 N.W.2d 786, 792 (1956).
Reluctance to approve termination is due in great part to serious hazards in assessing evidence about actions of parents and needs of children. To complete a statement of law, those dangers are noted:
Misgivings on the remedy are warranted, foremost, by the danger of smug judgment on the subject of poor parenting. Hence, the Supreme Court announced in Clausen the presumption that a continuing parental relationship is in the best interest of the child.[2] The court said:
In a termination proceeding * * * [the petitioner's burden of proof] is subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of his child and that it is ordinarily in the best interest of a child to be in the custody of his natural parent.
Clausen, 289 N.W.2d at 155-56.
Second, there is danger of a punitive approach when termination is based on misconduct of the parent which has no proven bearing on the qualities of parenting. Commonly, provocative but irrelevant evidence filters into the record. Here, for example, the record tells us the child was conceived in a contract prohibited by a judicial order. We are required to judge whether termination is clearly mandated by competent evidence.
Third, erroneous results are invited when the shield of social services becomes a sword. The Minnesota Legislature and the Supreme Court insist that real assistance precedes the judgment to terminate parental rights. Minn.Stat. § 260.155, subd. 7(2), (5), (6), (7). See Klugman, 256 Minn. at 119, 124, 97 N.W.2d at 429, 432; and Matter of Welfare of HGB, 306 N.W.2d 821, 826-27 (Minn.1981). Assistance from public agencies is easily transformed, not always noticeably, to a testing approach aimed at demonstrating parental failures. We are bound to closely scrutinize the integrity of public service efforts.
Fourth, information from neither the sciences nor the law provides much assistance in predicting whether parental misconduct will be prolonged and indeterminate. This is particularly evident when dealing with the behavior of those who are chemically dependent. Appellate courts commonly learn of changed, improved circumstances *799 of parents arising during the period of appeal, a troubling phenomena that teaches us to heed the mandate for grave cause in termination cases.
Fifth, there is no reason for confidence in judicial decisions about the needs of children. Our Supreme Court noted only last year the inadequacy of judicial determinations on the interests of children and a resulting hesitancy to interfere with a child's relationships. See Auge v. Auge, 334 N.W.2d 393, 399 (Minn.1983).
Finally, children affected by termination, especially those who are no longer infants, face the hazard that beneficial alternative care may not be available. It is a mistake to assume the existence of a good alternative. Instead, it must be asked in each case whether reasons for termination are so grave and weighty that the remedy is necessary whether or not agencies succeed in furnishing appropriate alternative care.
NOTES
[1] See Footnote 2.
[2] Further, aversion to severance of family ties is consistent with vital, vigorous public intervention in family affairs for child protection purposes. Child protection purposes and concern for family ties and parental custody are stated alongside one another in the Minnesota Juvenile Court Act. Minn.Stat. § 260.011, subd. 2. See Standard Juvenile Court Act, § 1 (1959, National Council on Crime and Delinquency. The Standard Act is the source of the Minnesota Juvenile Court Act). Comments on § 1 of the Standard Act succinctly state: "The well-established fundamental purpose of courts dealing with the children is to protect them and restore them to society as law-abiding young citizens. * * * [T]he preference in disposition in both the trial and the appellate courts is to keep a child in his home."